James R. GAMMILL and Deborah Dianne Gammill, Individually and as next friends of Curtis Gammill, a minor, and Jaime Michelle Gammill, a minor, deceased, Appellants,

v.

JACK WILLIAMS CHEVROLET, INC. and American Isuzu Motors, Inc., Appellees.

No. 2–95–284–CV.

Court of Appeals of Texas, Fort Worth.

Dec. 19, 1996.

Rehearing Overruled Jan. 30, 1997.

See also 972 S.W.2d 713.

Johnson & McElroy, and B. Thomas McElroy, Dallas, Texas, Patrick Fleming, Weatherford, Texas, for appellant.

Maxwell & Power, and James S. Maxwell, Betsy K. Power, and Marlene D. Thompson, Dallas, Texas, for appellee.

## OPINION

WEAVER, Justice.

Appellants, James R. Gammill and Deborah Dianne Gammill, individually, and as next friends of Curtis Gammill, a minor, and Jaime Michelle Gammill, a minor, deceased, the "Gammills", brought this products liability case seeking recovery of damages resulting from a one-automobile accident involving a 1988 Isuzu Trooper II. They appeal from a summary judgment granted in favor of appellees, Jack Williams Chevrolet, Inc. and American Isuzu Motors, Inc., the seller and manufacturer of the Trooper. We affirm.

The principal issue here presented is whether the trial court abused its discretion by disqualifying the Gammills' expert witnesses and by striking the controverting affidavits of two of their experts.

On July 5, 1988, at approximately 4:35 p.m., Deborah Dianne Gammill was driving her 1988 Isuzu Trooper II when it suddenly left the roadway and collided with a utility junction box and some trees. Her son, Curtis Gammill, was in the right front passenger seat, and her daughter, Jaime Gammill, was in the right rear seat. The Gammills alleged that as a result of the accident and impact Deborah Gammill and Curtis Gammill received incapacitating injuries and that Jaime received fatal injuries.

The Gammills' Third Amended Original Petition, filed on October 13, 1995, alleged: (1) the Trooper was defectively designed and uncrashworthy at the time it left the defendants' possession; (2) the restraint system for the right rear passenger seat of the Trooper was defectively designed and was unreasonably dangerous as designed; (3) Jaime's seat belt prematurely released during the impact of the accident in question; (4) design defects existed in the webbing loop at the buckle of the right rear seat belt and in the buckle release on the right rear seat belt of the Trooper; (5) an alternative safe design of the right rear passenger restraint system was available to Isuzu at little cost;

(6) Jaime was wearing her seat belt and it failed to restrain her at the time of the accident; (7) the Trooper was designed with a wiring harness under the dashboard that was too close to the accelerator mechanism; (8) the design of placing the throttle pedal in close proximity to the steering column was defective and unreasonably dangerous in that suddenly and without warning the throttle would not return to the idle position after being released, causing a loss of vacuum to the brake system; (9) at the time defendants sold the Trooper to the plaintiffs, defendants failed to give adequate warnings of the dangers or adequate instructions for the Trooper's safe use; (10) defendants represented that the Trooper possessed safety of performance characteristics which it did not have; (11) defendants failed to explain how the design of the seat belt restraint system could cause, enhance or aggravate injuries sustained by a user or passenger in the Trooper; and (12) defendants were negligent in the design, manufacture, distribution and marketing of the Trooper.

Appellees filed their motion for summary judgment on September 8, 1995, together with supporting affidavits. Previously, on May 19, 1995, the Gammills had designated David Lowry and Dr. Ronald Huston as expert witnesses in the case. On July 28, 1995, in a supplemental answer to the defendants' interrogatories, they designated Robert Bell as an expert witness, and on October 9, 1995, they further designated Robert Bell and Robert Evans as persons who may be called to testify and render expert opinions.

On September 20, 1995, the defendants moved to disqualify the Gammills' experts Lowry, Huston and Bell, claiming that the areas upon which those experts intended to testify and the opinions they had offered were either (1) not based on scientific knowledge grounded upon careful scientific methods and procedures; (2) not sufficiently tied to the facts of this case so that they would aid the jury in resolving a factual dispute; (3) not derived from scientific methods or supported by appropriate validation; (4) not based on scientifically valid reasoning and methodology; (5) not reliably based on the knowledge and experience of the expert's

discipline; or (6) essentially subjective beliefs and unsupported speculations based on hearsay. They also claimed that Bell should be disqualified from testifying as an expert because he was not designated as an expert until after the court-imposed deadline for making such designation. In support of their motion to disqualify, the defendants relied in part upon excerpts from Lowry's and Huston's deposition testimony given on July 28, 1995, including their respective Curricula Vitae, together with Bell's December 15, 1992 affidavit.

The trial court held numerous pretrial hearings. One was a hearing on October 5th and 6th, 1995, during which the Gammills had Lowry and Huston testify regarding their qualifications as expert witnesses and about further tests they wanted to conduct on the Trooper.

The Gammills filed their response to the motion for summary judgment on October 12, 1995. They relied upon the testimony given by Lowry and Huston before the trial court on October 6, 1995, as showing that they were qualified as experts to testify in the case and as controverting the defendants' summary judgment proof. They said they also expected to file affidavits of Lowry and Huston in opposition to Isuzu's motion for summary judgment. On October 13, 1995, the Gammills did file affidavits signed by each Lowry and Huston, and on October 25, 1995, they filed a supplemental affidavit signed by Lowry. Also, on October 13, 1995, the trial court signed an order disqualifying plaintiffs' experts, Robert Bell and Robert Evans.

On October 18, 1995, the defendants moved to strike Lowry and Huston's October 13th affidavits. That motion incorporated by reference all arguments and legal support cited in the motion to disqualify the plaintiffs' experts filed by defendants on September 20, 1995.

On October 25, 1995, the trial court held a hearing on the Defendants' Motion for Summary Judgment. At the conclusion of that hearing the trial court signed the order granting summary judgment in favor of appellees and dismissing the Gammills' claims against the appellees in their entirety. At that hearing, the trial court also considered the defendants' motions to disqualify plaintiffs' experts, Lowry and Huston, and to strike their October 13th affidavits, in connection with which the trial court signed two additional orders.

One was an order granting defendants' motion to disqualify both of plaintiffs' experts, Lowry and Huston. That order was replaced by two orders signed by the trial court on November 24, 1995, one granting the motion to disqualify Lowry, and the other granting the motion to disqualify Huston.[1] These two orders are the subject of point of error one.

The other order signed by the trial court on October 25, 1995, granted defendants' motion to strike the affidavits of both Lowry and Huston which were filed on October 13th. That order too was replaced by two orders signed by the trial court on November 24, 1995, one granting the motion to strike Lowry's affidavit, and the other granting the motion to strike Huston's affidavit.[2] These

1. These orders recite that the trial court considered the defendants' motions to disqualify; the testimony of Lowry and Huston at the October 5th hearing; the curricula vitae of Lowry and Huston; Texas Rule of Civil Evidence 702; the decision of the Texas Supreme Court in *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex.1995); and the decision of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). These orders also stated that the plaintiffs did not file a written response to the defendants' motions to disqualify, although they and their attorneys had ample and fair warning of the need to respond on the questions of qualification and disqualification.

2. These orders show that the trial court, in addition to the matters considered with respect to the orders disqualifying Lowry and Huston, also considered Texas Rule of Civil Procedure 166a(f) and the decision of this Court in *Jordan v. Geigy Pharmaceuticals*, 848 S.W.2d 176 (Tex.App.—Fort Worth 1992, no writ). They also recite that the plaintiffs did not file written responses to the defendants' motions to strike. The trial court was of the opinion that the defendants' motions to strike were well taken, and ordered that the affidavits of Lowry and Huston may not be considered as evidence in response to the Defendants' Motion for Summary Judgment.

two orders are the subject of point of error two.

A defendant moving for summary judgment assumes the burden of showing, as a matter of law, that the plaintiff has no cause of action. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). This can be accomplished by disproving one element of the plaintiff's cause of action. *Wornick Co. v. Casas,* 856 S.W.2d 732, 735 (Tex.1993). To recover for harm caused by an allegedly defective product, a plaintiff in Texas must prove, together with other elements, that the product was defective. *Rodriguez v. Ed Hicks Imports,* 767 S.W.2d 187, 192 (Tex. App.—Corpus Christi 1989, no writ).

The appellees claim that their motion for summary judgment and the attached affidavits proved that the accident vehicle in this case was not defective, that the accident occurred because the driver lost control of the Trooper, and that Jaime Gammill was not wearing her seat belt at the time of the accident. Thus, appellees claim, based on their motion and summary judgment proof, that they were entitled to summary judgment unless the Gammills, through their response to the motion for summary judgment and controverting proof, raised a material fact issue as to whether the Trooper was defective.

Appellees further claim that because the trial court granted their motions to disqualify the Gammills' experts and to strike their affidavits, the Gammills failed to raise a material question of fact as to the existence of a defect and that summary judgment was properly granted.

The Gammills, by six points of error, claim the trial court erred in: (1) disqualifying Lowry and Huston; (2) striking their affidavits; (3) disqualifying Bell and Evans; (4) denying their motion to test and inspect the accident vehicle; (5) denying their motion for a meaningful examination of the vehicle; and (6) compelling a mental examination of Deborah Gammill.

We will first determine the propriety of the trial court's actions in disqualifying Gammills' experts Lowry and Huston and in striking their affidavits. Because of the similarity of the issues, we will review points of error one and two together.

### Standard For Admission of Scientific Expert Testimony

The decision whether to admit evidence rests within the discretion of the trial court. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, and the test is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. A reviewing court cannot conclude that the trial court abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court committed a mere error in judgment. *See du Pont,* 923 S.W.2d at 558.

The standard for the admission of scientific expert testimony, under Rule 702 of the Texas Rules of Civil Evidence, was determined by the Supreme Court in *du Pont.*[3] The court specifically held that Rule 702 requires expert testimony to be relevant and reliable, and that under the standard which it adopted, which we refer to as the "reliability standard," in order for scientific expert testimony to be admissible under Rule 702, the proponent of such testimony, in addition to showing that the expert witness is qualified, must also show that the expert's testimony is relevant to the issues in the case and is based upon a reliable foundation. *du Pont,* 923 S.W.2d at 556.

---

**3.** In *du Pont,* the trial court excluded the testimony of plaintiffs' expert witness upon finding his opinions were not scientifically reliable and granted defendant's motion for a directed verdict. This court reversed, *Robinson v. E.I. du Pont de Nemours & Company, Inc.,* 888 S.W.2d 490, 493 (Tex.App.—Fort Worth 1994) holding that the trial court abused its discretion by excluding the expert testimony since the defendant had not contested the expert's qualifications, only the methodology and research upon which he based his opinions. The Supreme Court held, because the proponent of the expert testimony failed to establish that the proffered testimony was scientifically reliable under the standards adopted in *du Pont,* that the trial court did not abuse its discretion by excluding the testimony, and reversed the opinion of this court and affirmed the judgment of the trial court.

The Supreme Court said there are many factors that a trial court may consider in making the threshold determination of the admissibility of evidence under Rule 702, including the following six non-exclusive factors: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the expert's subjective interpretation; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Id.* at 557.

The Supreme Court went on to say that trial courts may consider other factors which are helpful in determining the reliability of the scientific evidence, and that these factors will differ with each particular case. *Id.* at 557. The Supreme Court's opinion in *du Pont* contains numerous quotes, statements and comments which we interpret as lending at least some credence to a long laundry list of additional factors or guidelines that trial courts may consider in determining the admissibility of scientific expert testimony under the "reliability standard." Some of those, which we consider to be germane to this case, are: [4]

> In order for expert testimony to be admissible under Rule 702, the witness must be qualified and his proposed testimony must be "scientific ... knowledge". *du Pont,* 923 S.W.2d at 556.

> In order to constitute scientific knowledge which will assist the trier of fact, the proposed testimony must be relevant and reliable. *Id.* at 556.

> An expert scientific opinion must be grounded, at the very least, on some demonstrable underlying scientific data or logical inference therefrom. *Id.* at 556.

Evidence is reliable if the underlying theory and the technique applying it are valid, and if the technique is properly applied on the occasion in question. *Id.* at 556.

Evidence which departs from the scientific method should not be admitted. *Id.* at 554.

Scientific evidence which is not grounded in the methods and procedures of science is no more than subjective belief or unsupported speculation. *Id.* at 557.

An expert who is trying to find a cause of something should carefully consider alternative causes. Failure to rule out other causes renders the expert's opinion little more than speculation. *Id.* at 559.

Coming to a firm conclusion first and then doing research to support it is the antithesis of the scientific method. *Id.* at 559.

Whether, instead of reasoning from known facts to form a conclusion, the expert reasoned from an end result in order to hypothesize what needed to be known but was not. *Id.* at 559.

The fact that an expert conducted his research for the purpose of testifying, rather than independently of any litigation, weighs against the admissibility of his testimony. *Id.* at 555, 559.

Opinions formed solely for the purpose of testifying are more likely to be biased toward a particular result. *Id.* at 559.

Once the party opposing the expert testimony objects, the proponent of the evidence bears the burden of demonstrating its admissibility. *Id.* at 557. The trial court is responsible for making the preliminary determination of whether the proffered expert testimony is admissible. The trial court's role is not to determine the truth or falsity of the expert's opinion, but rather to determine whether the expert's opinions are relevant and whether the methods and research upon which they are based are reliable. *Id.* at 556, 558.

---

4. Some of the additional factors listed below are obviously expansions upon the six nonexclusive factors listed above. Also, the Supreme Court in *du Pont* discusses at length the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the decision of the Texas Court of Criminal Appeals in *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App. 1992), and stated that it was persuaded by the reasoning in those cases. Thus, we are of the opinion that the guidelines set forth in *du Pont,* at least in part, should be viewed in light of the reasoning expressed in those decisions.

The trial court found Lowry's and Dr. Huston's opinions (1) of a design defect in the restraint system, (2) regarding the nature of Jaime's injuries, (3) that Jaime was not wearing her seat belt, (4) that her seat belt prematurely released and (5) that an alternative design restraint system existed:

> Were not shown to be grounded upon careful scientific methods and procedures; do not contain or demonstrate a careful scientific investigation upon which reliable conclusions could be based; were not shown to be derived by scientific methods and were not supported by appropriate validation; were not of the types reasonably relied upon by experts in the field; and were essentially subjective beliefs and unsupported speculation. Further, that the reasoning and methodology underlying their opinions were not shown to be scientifically valid and were not shown to have a reliable basis in the knowledge and experience of the discipline (engineering).[5]

We will now review the testimony and affidavits of Lowry and Huston, in light of the standard and guidelines espoused by the Supreme Court in *du Pont*, to determine whether their testimony was relevant to the issues in the case and was based upon a reliable foundation, and thus whether the trial court abused its discretion in disqualifying Lowry and Huston and in striking their affidavits.

### David Lowry's Testimony

 David Lowry first became aware of the Gammills' lawsuit in January of 1995. He was engaged by the Gammills in this case to examine the accelerator system of the Trooper. He offered no testimony or opinions as to whether the accelerator system was defectively designed. He was also engaged by the Gammills to study the Trooper's occupant restraint system. He examined the Trooper on April 11th, June 30th and October 7th, 1995. He reviewed the autopsy report and photographs, the investigating officer's report of the accident, statements of emergency care attendants and some of the attending physicians, and the affidavits of the defense experts, Carr, Smith and Manning. Lowry testified that he disassembled and rebuilt two exemplar seat belts from a 1987 Isuzu trooper, and also that he documented (by placing his nephew in an exemplar seat belt and having him move forward) that the head of a child wearing the rear seat belt in the Trooper could hit or touch the back of the front seat when the child moves forward and when the seat belt is at maximum spool.

The record reflects the following testimony by Lowry regarding his opinions and beliefs about the restraint system:

> The accident in question resulted in the death of Jaime who was sitting in the right rear seat;

> Jaime was wearing her seat belt at the time of the Trooper's initial impact with fixed objects;

> The seat belt was inadequately designed and failed to restrain Jaime and save her life;

> The seat belt was designed with a D ring, which is a bad seat belt design;

> A seat belt for a child should not be fitted with a sliding D ring to enable a child to scoot forward in the seat;

> The seat belt (used by Jaime) will allow both the buttocks and the chest of an occupant to slide to the very front edge of the seat, and a seat belt that allows that is defectively designed;

---

**5.** In the two disqualifying orders of November 24, 1995, the trial court also found that Lowry and Huston offered no testimony or opinions regarding whether: the Trooper was designed with a wiring harness under the dashboard too close to the accelerator mechanism; the design of placing the throttle pedal in close proximity to the steering column was defective and unreasonably dangerous in that suddenly and without warning the throttle would not return to the idle position after being released causing a loss of vacuum to the brake system; at the time defendants sold the Trooper to plaintiffs, defendants failed to give adequate warnings of the dangers or adequate instructions for safe use of the Trooper; the Trooper was represented to possess characteristics of safety or performance which it did not have; and whether the defendants failed to explain how the design of the seat belt restraint system could cause, enhance or aggravate injuries sustained by a user or passenger. The Gammills present no arguments regarding these findings.

A properly designed seat belt will not allow a child's 'rear end' to slide around in the seat, and thus develop dangerous slack;

A safer alternative design is available;

The restraint system in the Trooper had a mere loop, where other systems have either a frictional clasp or a flap buckle or other means by which, once fastened, the lap belt does not extend further;

The seat belt either became unbuckled or it went forward enough to allow Jaime to hit the seat in front of her;

Lowry "believed" that the seat belt served as a pivot about which Jaime rotated as her body was carried forward;

Jaime was released from the seat belt restraint and then struck the back of her mother's front seat (the driver's seat);

This movement by Jaime was evidenced by a relatively low point of impact on the back of the driver's seat;

If Jaime had not been belted, she would have impacted the front windshield and possibly gone through it, or in any event would have struck the rear of the front seat back at a much higher position than markings on the seat show;

The restraining force of the seat belt was equivalent to the force required to produce the dislocated hip, bruised pelvis and bruised chest that Jaime incurred immediately prior to her head injuries resulting in her death;

Had the seat belt functioned properly, it would have been heavily loaded and it would have saved Jaime's life; and

The seat belt caused injuries to Jamie, and was defective in that it failed to keep her restrained but released her to impact.

Lowry is a professional engineer. In 1984 he received a Bachelor's Degree and in 1987 he received a Master's Degree in Mechanical Engineering from Texas A & M University, and has pursued, but not completed, a Ph.D. from Southern Methodist University in that field. From 1984 to 1985, he worked as a design engineer in the quality assurance department at Texas Instruments (TI). While at TI, he worked on the high-speed anti-radiation missile, the HARM missile, and on a secret project called Project 101. In 1985 he went back to school for his Master's degree, and in 1987 he went to work for General Dynamics. He was hired in the fatigue failure department of General Dynamics and was assigned to the F–111 in the fighter division.

He is currently employed by Lockheed, which purchased the fighter division of General Dynamics, and continues to work in the area of fatigue assessment, where: he is in charge of incorporating design details into the construction of an F–22 fighter; his job is to look at nonconformances when fastener holes are not located correctly or parts don't quite meet the blueprint, or there are gouges or other nonconformances to engineer designed blueprints; and his work includes studies to see whether or not design features have been met.

Lowry also listed, as part of his work background, his work as an automotive mechanic while he was working on his Master's degree, where he installed cruise controls; repaired brakes, water pumps, cylinder heads, engine mounts, electrical shorts and universal joints; replaced rear-ends; pulled transmissions; and did radiators, tune-ups and carburetor rebuilding.

For approximately four years, Lowry has also done outside consulting work through his private firm, Forensic Analysis Consulting Technologies, which focuses only on litigated cases. When asked if in connection with his consulting work he had done other work, previous to this case, having to do with automobiles and with the principles that would be involved in products liability automobile litigation, Lowry replied "yes." He did not detail the other work he had done previous to this case, but did indicate that he was currently working on: an aerospace auto 350 helicopter failure; a conveyor belt hand case where barriers were not installed; a seat back failure; a tow vehicle rollover case; a valve failure at Alliance Airport; a cylo failure due to improper installation; a cylo failure from corrosion; a foundation analysis for sheer and tension cracks; and a pressure injection case.

Thus, the Gammills argue that Lowry was an eminently qualified witness in this case, and that his testimony was based on established laws of physics and engineering. However, the appellees argue that the first requirement of Rule 702, that the witness be qualified, was not met with respect to Lowry. They then argue, in effect, even if Lowry is found to be qualified under the first requirement of Rule 702, that his testimony regarding his opinions and conclusions does not meet the "reliability standard" under *du Pont.* The record reflects, with respect to Lowry, that:

All of his current consulting work relates to litigated cases;

As evidenced by his work history, he has no experience or expertise in the design or manufacture of automobiles;

Almost all of his experience relates solely to fatigue and fracture work on fighter jets;

He has taken no courses in automotive-design or manufacturing, and has never been employed by an automotive manufacturer;

He has never written any reports on wiring harnesses, accelerators or seat belt design;

He has no formal training in the field of injury causation;

He has not published any documents outside his work for Lockheed and he is not a member of any professional engineering organization;

He has no design or manufacturing experience regarding motor vehicle components and, particularly, he has never had any exposure to the design or manufacture of wiring harnesses, accelerators or seat belts; and

The only experience he has in any automotive capacity is in a brief part-time job repairing automobiles during the time he worked on his Master's degree. There is nothing in the record which indicates that this experience was related to seat belts.

At his deposition on July 25, 1995, Lowry testified that he had no theories or conclusions regarding the Gammills' case. However, he said he had talked to other people about the case, that a Mr. Rosenblutch told James Gammill that he had recreated the throttle stickage problem, and following which, James Gammill asked Lowry to look at the throttle. Also, James Gammill had told Lowry about the bruising on Jaime's pelvis and said the autopsy report showed those were seat belt marks. Lowry also said he had read depositions with regard to where Jaime's body was found.

At the October 6th hearing, Lowry testified his theories were that Jaime's seat belt was inadequately designed; the lap portion should be fixed; the seat belt failed to restrain Jaime and save her life; the back of the driver's seat was severely damaged from the impact of Jamie; the low impact mark on the back of the driver's seat indicates a porpoising, which means Jaime was rotated or pivoted about some object which threw her downward instead of upward toward the windshield; and that Jaime's impact with the back of the driver's seat resulted in her death. These "theories," as expressed by Lowry at the October 6th hearing, which we view as being more in the nature of conclusions rather than scientific theories, were essentially the same as the "opinions" expressed in his affidavit of October 13, 1995. In fact, when Lowry was quizzed at the October 6th hearing as to why he had no theories at the time of his July deposition, he said "I assumed that I was going to get a more thorough inspection before coming up with theories because I like my theories to be close to my conclusions instead of having to change them."

We find nothing in the record indicating the scientific theories or principles, if any, on which Lowry relied in reaching his opinions. When asked if the basic science of physics, as to stress loads and design factors, is the same for both airplanes and automobiles, Lowry replied: "It's based on the laws of physics. I'd call it more the laws of engineering just because we have to apply the laws of physics in [the] every day world." Again, we find nothing in the record to indicate what theories or principles of physics or engineering Lowry relied upon in reaching his opinions.

The appellees also urge that Lowry moved from the position of a potential expert witness in the case to that of an advocate for the Gammills. During a hearing called by the trial court on July 31, 1995, for which the Gammills' attorney was running late, Lowry attempted to persuade the trial court to take a certain course in its rulings on the Gammills' Motion for Meaningful Inspection of Accident Vehicle, and asked that he be able to speak on the matter because, in his words, he would "hate to see the Gammills denied justice." Defense counsel objected to any statements by Lowry outside the presence of the Gammills' counsel due to the fact that he was not an attorney or a party in the case. When the trial court cautioned Lowry that he might be crossing the line from expert to advocate, and may have already said too much if he was expecting to be designated an expert, Lowry forged ahead and stated: "Okay. Well in ignorance, I'd like to risk saying one more thing." Despite being cautioned by the trial court, and despite objection by defense counsel, Lowry proceeded to argue on behalf of the Gammills' motion. The appellees argue, and we think rightfully so, that Lowry's actions showed to the trial court that his purpose in the case was to attempt to create a liability theory in order to obtain "justice" rather than to offer opinion testimony supported by the facts and based on an existing theory and scientific evidence.

We find nothing in the record to indicate or show that: Lowry conducted tests to exclude other possible causes or results from those expressed in his opinions; his technique or methodology has been subjected to a rate of error analysis; his theories have been tested; the theories on which he based his opinions have been subjected to peer review or publication; or whether his underlying theories or techniques have been generally accepted as valid by the relevant scientific community. Also, the record supports any finding or conclusion the trial court may have made that Lowry's research and opinions in this case were conducted and formed for the purpose of litigation, and that the same were essentially based on subjective belief and unsupported speculation.

We find the Gammills did not meet their burden of demonstrating that Lowry's proffered testimony was based upon a reliable foundation, and that the trial court did not abuse its discretion in disqualifying Lowry as an expert and in striking his affidavit.

### Dr. Ronald Huston's Testimony

█ Dr. Huston was retained by the Gammills in this case to work on issues related to biomechanics and injury causation, focusing primarily on the right rear passenger and possibly on the driver. In his affidavit, filed on October 13, 1995, in response to Defendants' Motion for Summary Judgment, Dr. Huston opined, with respect to Jaime Gammill that:

Jaime, the right rear seat occupant, was wearing the available lap and shoulder belt at the beginning of the accident, and her seat belt prematurely released during the impact, allowing her to receive fatal head injuries from striking the right rear corner of the driver's seat back. According to Dr. Huston, the following matters support his conclusions and are consistent with Jaime's seat belt usage at the time of the accident:

Markings on the front of the shirt Jaime was apparently wearing and warping marks on the back of her shirt, directed toward her left shoulder;

Apparent shirt fibers observed in the seat belt webbing;

Marks on the seat belt webbing and dimple warpings in the shoulder belt webbing;

The impact location on the driver's seat back; and

The dent in the right rear corner and the blood on the back of the driver's seat;

An examination of Jaime's seat back showed it had a three-point, single retractor continuous webbing system with a flow-through (non-cinching) feature at the buckle. He said the webbing loop at the buckle on the seat belt allowed the webbing to flow through the loop, and in turn allowed looseness to occur in the webbing, and that the seat belt with the use of the webbing loop was defectively designed;

The buckle on Jaime's seat belt had a side button release, requiring approximately 2½ pounds of pressure to release the latch plate. He opined that the use of a side push button buckle release on the seat belt, and with the buckle approximately 5 inches away from the seat bottom, created a configuration ideally suited for premature release of the buckle upon impact. He said that this buckle release was defectively designed, allowing Jaime's fatal injuries to occur; and

A properly fitting and secure lap and shoulder seat belt system (three-point system) should have provided sufficient restraint to keep Jaime in place during the course of the accident and impact, and would have prevented her fatal injuries.

Dr. Huston also said that from his examination of Jaime's seat belt and its retractor he found the rapid webbing spool-out arrest to be working properly, and that the condition of the hardware did not provide evidence that it was not working properly.

Dr. Huston said he reached his opinions based upon his investigation, document review, vehicle inspection, inspection of other things, testings and his knowledge and experience. His affidavit indicates that he reviewed the Texas Peace Officer's report, Medical Investigator's report, material from the office of the Chief Medical Examiner, depositions of the officer who investigated the accident and James Gammill, the defendants' Motion for Summary Judgment, the affidavits of the defendants' supporting experts Lee Carr and Harry Smith, and Dr. Charles Manning's accident reconstruction analysis report. He inspected the Trooper, accident vehicle photographs, autopsy photographs and x-ray films of Jaime, photographs of Jaime's shirt, and the shirt reported to have been worn by her at the time of the accident.

With respect to Deborah Gammill, the driver, Dr. Huston opined that she was wearing her seat belt, but that the seat belt did not prevent her incapacitating injuries. He said there was scarring of the guide loop of her seat belt indicating seat belt use and loading, but that while the seat belt provided some restraint it was insufficient to prevent her facial injuries from steering wheel contact. He said that as a result of the accident and impact she reportedly received incapacitating injuries. Dr. Huston did not say that Deborah Gammill's seat belt was defective and offered no scientific reasoning for reaching his opinions regarding her injuries.

Dr. Huston, Ph.D., is a Professor in the Department of Mechanical Industrial and Nuclear Engineering at the University of Cincinnati where he has taught mechanical engineering for over 33 years, and where he works mainly as a professor. He has performed outside consulting work for approximately 20 years. He has written over 100 journal articles, 125 conference papers, 45 technical reports, and two books summarizing the results of his research. He has testified as an expert in over 325 depositions and in over 145 trials. He is not a medical doctor and has received no formal medical training.

As with Lowry, the Gammills argue that Dr. Huston was an eminently qualified witness in this case, and that his testimony was based on established laws of physics and engineering. The appellees do not appear to argue that the first requirement of Rule 702, that the witness be qualified, was not met with respect to Dr. Huston. They do, however, argue that his testimony does not meet the "reliability standard" under *du Pont.*

During his deposition on July 28, 1995, Dr. Huston testified he was initially contacted regarding this case in April 1995, by the Gammills' attorney, with whom he was working on another case, and who told him he would like him to look at this case, and that he thought Jaime collided with the driver's seat. The attorney also sent Dr. Huston photographs of Jaime's body.

Dr. Huston said he had reviewed photographs taken by Lowry. Also that he had a conversation with Lowry during which Lowry told him about the evidence, about his belief that there was trouble with the accelerator, and about the deformation on the back of the driver's seat.

A large portion of Dr. Huston's deposition testimony dealt with further testing he wanted to conduct on the Trooper. However, he

said there was reason to believe that the investigating officer's report, that Jaime was not wearing her seat belt at the time of the accident, was incorrect.

At the October 6th hearing, Dr. Huston testified that he has expertise in the field of biomechanics and that in this case he had made some study of materials made available to him in an effort to seek the cause of Jaime Gammill's death. He said it appeared to him, from the documents he had reviewed, and from what he had come to know, that there was evidence that Jaime was wearing her seat belt at the time of the accident. He did not elaborate on what he had come to know or on the evidence to which he referred.

Dr. Huston was present when Lowry testified on October 6, 1995, regarding various types of seat belts. In response to questions during the trial regarding his qualifications, Dr. Huston testified:

He had done some seat belt investigations that relate to the different type of seat belt designs that Lowry was just talking about—different type of designs;

With respect to the sort of things Lowry mentioned—that there can be a D ring, or there can be a belt that has no D ring, and there can be a kind of seat belt that is designed so that when you sit there, it's gradually going to get a little bit tighter, approximately, and it will not just gradually get looser, somebody can't just pull on it and make it looser just because they want to—Dr. Huston said he had worked on all those issues;

He had written papers on the configuration of seat belts, defective lap belt and shoulder belts, but indicated that the papers he referred to had been primarily concerned with occupant biomechanics and the design of the seat belt, and that most of the design work he had done was regarding his personal consulting and testimony; and

He had not expressed an opinion in writing that the design of the seat belt designed with a D ring, as referred to by Lowry, was an inappropriate or negligent or improper kind of design for a seat belt.

Also, that he had not written any articles on seat belt buckles.

Despite Dr. Huston's impressive background as a professor and as an engineer, in research and as an author, we find nothing in the record to show that he was qualified to express opinions regarding the condition of Jaime's body or the cause of her death. In addition, we find nothing in the record to indicate what theories or principles of science Dr. Huston relied upon in reaching his opinions.

Also, we find nothing in the record to indicate or show that: Dr. Huston conducted tests to exclude other possible causes or results from those expressed in his opinions; his technique or methodology has been subjected to a rate of error analysis; his theories have been tested; the theories on which he based his opinions have been subjected to peer review or publication; or whether his underlying theories or techniques have been generally accepted as valid by the relevant scientific community. The record supports any finding or conclusion the trial court may have made that Dr. Huston's research and opinions in this case were conducted and formed for the purpose of litigation, and that the same were essentially based on subjective belief and unsupported speculation.

We find the Gammills did not meet their burden of demonstrating that Dr. Huston's proffered testimony was based upon a reliable foundation, and that the trial court did not abuse its discretion in disqualifying Dr. Huston as an expert and in striking his affidavit.

█ The Gammills argue that the decisions in *Daubert* and *du Pont* do not support the appellees in this case, as only established principles of physics and engineering were used by Lowry and Dr. Huston. As we have discussed above, the record fails to show the specific principles of physics or engineering upon which Lowry and Dr. Huston supposedly based their opinions. A bald assertion that valid scientific principles were used is not enough. *du Pont*, 923 S.W.2d at 559.

The Gammills cite *Compton v. Subaru of America, Inc.* 82 F.3d 1513 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 611, 136

L.Ed.2d 536 (1996), for the proposition that the factors outlined in *du Pont* apply only when a proffered expert relies on some principle involving unique, untested or controversial methodologies. They contend, because the Gammills' proof involves only established principles of physics or engineering, grounded on the experts' own experience and training, and not on some "exotic" or "novel" theory, that the appellees' objections should go only to the weight of the experts' testimony and not to the admissibility of what they say. They also claim that the exclusion of the opinion evidence of Lowry and Dr. Huston, under the circumstances of this case, amounts to a death knell to all products liability-automotive claims in Texas. These arguments are rejected. We find the language of the *du Pont* decision clearly directs that the factors set forth therein are applicable to the disposition of the case now before us.

Points of error one and two are overruled.

By point of error three, the Gammills claim the trial court erred in disqualifying their experts Robert Bell and Robert Evans. The defendants filed a written motion to disqualify Bell because, among other reasons, he was not timely designated as an expert, and made an oral motion to disqualify Evans. Those motions were granted by an order signed by the trial court on October 13, 1995.

The trial court's scheduling order required the Gammills to designate all experts by May 19, 1995. Bell and Evans were designated as experts on October 9, 1995. The Gammills also claim that Bell was designated as an expert in their July 28, 1995, supplemental answer to the defendants' interrogatories. In any event, the Gammills do not dispute that Bell and Evans were not designated as experts until after the May 19th deadline.

In reviewing a court's decision regarding untimely designation, the appellate court should apply an abuse of discretion standard. *Aluminum Co. of America v. Bullock,* 870 S.W.2d 2, 3 (Tex.1994). A court's scheduling order controls discovery dates in the absence of a subsequent Rule 11 agreement or court order changing the pretrial dates. *Beamon v. O'Neill,* 865 S.W.2d 583, 585 (Tex.App.—Houston [14th Dist.] no writ). The record reflects no subsequent Rule 11 agreement or court order amending the May 19th deadline. Thus, the designation of Bell and Evans as experts is shown on its face to be untimely. Rule 215(5), TEX. R.CIV.P. requires the testimony of an expert witness who is not timely designated be excluded unless good cause is shown.

The Gammills argue that good cause existed to allow the late designations because the untimely designated experts were well-qualified and because the appellees were not surprised. They claim appellees were not surprised because: Bell Laboratory, through Bell, produced an affidavit for Isuzu's counsel in December of 1992; Bell was previously identified in a "writing" (to which no record reference is made) among liability experts to be relied upon by the Gammills; and because Bell had simply been in the case from an early time. None of these reasons, however, constitute good cause. The showing of good cause must be the showing of good cause for failure to timely designate. *See Clark v. Trailways, Inc.,* 774 S.W.2d 644, 646 (Tex.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1028 (1990). Evidence regarding whether a person is qualified to offer expert opinions does not explain why that person was not timely designated. Also, the absence of surprise or unfairness does not constitute good cause. *Sharp v. Broadway National Bank,* 784 S.W.2d 669, 671 (Tex.1990). This case was filed on March 23, 1990, more than five years before the scheduling order required the Gammills to designate their experts.

The Gammills further argue that the scheduling order, having been set by the trial court, remained subject to its discretion, and that it was an abuse of discretion to disqualify Bell, a man of high credentials. The Gammills cite no authorities in support of their arguments under point of error three. We find the trial court did not abuse its discretion in disqualifying Bell and Evans. Point of error three is overruled.

Under points of error four and five the Gammills claim the trial court erred in granting the summary judgment by denying their

motion to test and inspect the accident vehicle and by denying their motion for meaningful examination of the vehicle. They present no arguments under these points regarding the summary judgment. Apparently they claim that the trial court's actions in denying or limiting inspections of the Trooper possibly prevented them from presenting controverting proof in response to the defendants' motion for summary judgment.

■ The Gammills' motion to test and inspect the Trooper, which is the subject of point of error four, was filed on August 17, 1995. At the hearing on October 6, 1995, the trial court heard extensive testimony from both Lowry and Dr. Huston, and questioned them both, regarding their desires to conduct further tests on the Trooper.

Dr. Huston said he had made a brief inspection of the vehicle on July 28, 1995, that he had not had an opportunity to look at the restraint system as carefully as he would like, and that he would simply like to look at the vehicle one more time. Lowry had previously examined the vehicle on April 11th and June 30th, 1995.

At the October 6th hearing, the trial court ruled that Huston and Lowry could examine the Trooper on October 7, 1995, but that they were not to do destructive testing. The permission granted by the trial court generally included: taking further photographs; removing and looking behind the panel to look for load markings on the webbing and within the seat belt retractor; testing the retractor; measuring the force it takes to release the seat belt buckle; looking at the B pillar in the vehicle; looking at the driver's seat; and looking at the accelerator harness. The trial court specifically ruled that it was not granting permission to do destructive testing, to disassemble the parts of the trooper which are examined, or to take the retractor out of the vehicle. The trial court further stated that Huston and Lowry could examine the trooper the way it is, and that if the Gammills wanted to come back to the court after their examinations were completed, and describe what Huston and Lowry had seen and found during the examinations, that the court would consider whatever further tests the Gammills might want to do.

On October 13, 1995, the Gammills filed the affidavits of Huston and Lowry which were prepared subsequent to their examination of the Trooper on October 7th. Huston's affidavit makes no mention for the need for further tests. Lowry's affidavit states that the rear seat belts need to be removed to inspect the emergency locking mechanism for load marks and to match fibers found in the webbing with those removed from Jaime's shirt, and that four to six inches of the mylar would be needed to be removed for examination of the scrape mark and the inside of the shroud. These affidavits were apparently considered by the trial court at the time the order denying the Gammills motion to test and inspect the vehicle was signed by the court, which was also on October 13, 1995.

Thereafter, on October 18, 1995, the Gammills did file a renewal motion to further inspect the vehicle. The record does not reflect that any hearing was ever had or requested on that motion, and the Gammills did not raise the denial of their request for further inspection in their response to the defendants' motion for summary judgment.

Rule 167, Texas Rules of Civil Procedure provides for discovery, and the production for inspection and testing, of tangible property which constitutes matters within the scope of Rule 166b. Section 1. g. provides that testing and examination shall not extend to destruction or material alteration of an article without notice, hearing, and prior approval by the court.

■ The trial court's order regarding discovery will not be disturbed in the absence of a clear abuse of discretion. *Texaco, Inc. v. Dominguez*, 812 S.W.2d 451, 458 (Tex.Civ. App.—San Antonio 1991, no writ). Here, the trial court permitted Huston and Lowry to further examine the Trooper on October 7, 1995, and obviously considered and rejected Lowry's reasons as to why other tests should be made. In addition to the five tests performed on the vehicle by Huston and Lowry, the record shows the Trooper was previously inspected on seven different occasions by five other experts designated by the Gammills. In light of the record as a whole, and particu-

larly in light of the trial court's offer to consider other reasons which the Gammills might urge for additional inspections, and which they did not pursue, we find the trial court did not abuse its discretion in denying further inspection of the Trooper by the Gammills and in signing the order of October 13, 1995. Point of error four is overruled.

Point of error five concerns the Gammills' motion for meaningful examination of the Trooper that was filed on May 17, 1995. After holding two hearings and reviewing the affidavits submitted by the parties, the trial court denied that motion on August 18, 1995. The order recites the trial court had conducted two hearings with respect to the motion, one on June 27, 1995, and the second scheduled for 9:00 a.m., July 31, 1995, and moved at the request of the Gammills' attorney to 2:00 p.m. on that date. The Gammills' attorney did not appear for the latter hearing due to faulty airline connections and bad weather. The record does not reflect that he took any actions to have the hearing rescheduled prior to the time the order denying the motion was signed on August 18, 1995. However, at the hearing on October 6, 1995, the trial court granted the request of the Gammills' attorney to reconsider its prior ruling on that issue. At that hearing Lowry and Huston both said any further testing which they wanted to conduct on the Trooper was nondestructive.

It appears that the trial court withheld a final ruling on that motion until after it heard the October 6th testimony of Huston and Lowry and had considered their October 13th affidavits. The same was then addressed by the trial court in its order of October 13, 1995, which recited that the court heard the Gammills' motion to test and inspect the Trooper and/or "Review Prior Order on Same." Thus, it appears that any complaint which the Gammills had about the hearing on July 31, 1995 was addressed and adequately disposed of by the trial court's order of October 13, 1995.

The Gammills cite no authorities regarding point of error five, in either their original or their reply brief. Neither do they advise us with any details as to what meaningful examination they proposed to make of the vehicle or the reasons therefor, other than those previously submitted to and ruled on by the trial court. The main gist of the Gammills' comments under this point seems to be that the trial court's "mind was dead set against" them and that it was difficult for them to recall any hearing where the trial court showed any concern for their right to proceed to trial.

We hold the trial court did not abuse its discretion when it denied the Gammills' motion on August 18, 1995, and as reconfirmed by its order of October 13, 1995. Point of error five is overruled.

Under point of error six, the Gammills claim the trial court erred in ordering Deborah Gammill to submit to a mental exam by a physician and a psychologist. The order complained of was signed by the trial court on October 13, 1995. This point is not shown as having any bearing on the Gammills' appeal from the motion for summary judgment. Thus, because of our ruling herein, affirming the summary judgment entered by the trial court, we do not address that issue. Point of error six is overruled as being moot to our disposition of this appeal.

The judgment of the trial court is affirmed.

CAYCE, C.J., DAY, and H. TOD WEAVER, JJ. (Retired) (Sitting by Assignment).