**Debra MARKWARDT, Appellant,**

v.

**TEXAS INDUSTRIES, INC., Appellee.**

**No. 14–09–00335–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 23, 2010.

---

Eric D. Pearson, Michael E. Heygood, Dallas, for appellant.

Brett Dosher Lamb, Dallas, Stacy R. Obenhaus, Houston, for appellee.

Panel consists of Justices YATES, SEYMORE, and BROWN.

## OPINION

CHARLES W. SEYMORE, Justice.

Appellant, Debra Markwardt, appeals a summary judgment in favor of appellee, Texas Industries, Inc. ("TXI"), in Markwardt's suit for trespass, nuisance, negligence, and gross negligence, alleging damages arising out of emissions from TXI's cement plant located near Markwardt's property. In ten issues, Markwardt contends the trial court erred by granting summary judgment on the ground that her claims are barred by the statute of limitations. We affirm.

## I. BACKGROUND

Since 1988, Markwardt has owned property in Midlothian, Texas, on which she resides and raises dogs for sale. For decades, TXI has operated a cement plant within a mile of Markwardt's property. Markwardt contends TXI began burning hazardous waste as fuel in 1987 or 1988 and emissions from this activity contained toxic substances. Markwardt alleges that accumulation of such substances over the years has contaminated her soil, air, and groundwater, caused her health problems, including chronic bronchitis, lung problems, fatigue, headaches, ulcers, and nausea, and adversely affected the health of her dogs.

On March 12, 2008, Markwardt sued TXI for trespass, temporary nuisance, negligence, and gross negligence. She seeks compensation for lost use and enjoyment of her land, contamination of the property, damages to her health and well-being, physical pain and mental anguish, damages to the health and well-being of her dogs, and lost profits in her dog-breeding business. TXI filed a traditional motion for summary judgment on the ground that Markwardt's claims are barred by the statute of limitations. In her live petition and summary-judgment response, Markwardt raised several grounds for avoiding the limitations bar, including the discovery rule, a CERCLA provision, the continuing-tort doctrine, and fraudulent concealment.[1]

---

1. Markwardt filed her live pleading after TXI filed its motion but before the trial court granted summary judgment. Markwardt did not add any claims but amended some factual allegations and added grounds for avoiding the limitations defense. TXI's motion was sufficient to encompass the additional factual allegations and any grounds for avoiding limi-

tations that TXI bore the burden to negate. *See Espeche v. Ritzell,* 123 S.W.3d 657, 664 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (recognizing, even when new claim is added in amended petition, if previously-filed motion for summary judgment is sufficiently broad to encompass that claim, movant need not amend the motion).

The trial court signed an order granting TXI's motion for summary judgment and dismissing Markwardt's claims with prejudice. On March 31, 2009, the trial court signed a judgment nunc pro tunc, correcting a clerical error in the original judgment.

## II. STANDARD OF REVIEW

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003). A defendant moving for summary judgment must conclusively negate at least one element of the plaintiff's theory of recovery or plead and conclusively establish each element of an affirmative defense. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). If the defendant establishes its right to summary judgment, the burden shifts to the plaintiff to raise a genuine issue of material fact. *Id.* We review a summary judgment *de novo. Knott,* 128 S.W.3d at 215. We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Id.*[2]

**2.** This case was transferred to our court from the Waco Court of Appeals; therefore, we must decide the case in accordance with the Waco court's precedent if our decision would be otherwise inconsistent with its precedent. *See* Tex.R.App. P. 41.3.

**3.** In its motion, TXI contended Markwardt did not allege any personal injuries because her lung problems, fatigue, headaches, and nausea are merely symptoms of discomfort, not disease; therefore, by proving Markwardt's nuisance claim was barred by limitation, TXI also established entitlement to summary judgment on all her claims. *See Bates,* 147 S.W.3d at 269, 292 (stating plaintiffs alleged only nuisance damages, not personal

## III. ANALYSIS

In ten issues, Markwardt contends the trial court erred by granting summary judgment on the limitations ground. Markwardt's alleged damages essentially fall into three categories: (1) typical nuisance damages such as lost use and enjoyment of her land; *see Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 269 (Tex.2004) (defining "nuisance" as "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities"); (2) damage to both real property and personal property—her dogs; and (3) Markwardt's own personal injuries. However, it is unclear to which pleaded claim—nuisance, trespass, negligence, or gross negligence—Markwardt attributes each element of damages or whether she seeks multiple elements of damages for each claim. Nonetheless, all her claims are governed by a two-year statute of limitations. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (West Supp.2009); *Bates,* 147 S.W.3d at 270; *W.W. Laubach Trust v. Georgetown Corp.,* 80 S.W.3d 149, 158–59 (Tex.App.-Austin 2002, pet. denied); *Am. Centennial Ins. Co. v. Canal Ins. Co.,* 810 S.W.2d 246, 255 (Tex.App.-Houston [1st Dist.] 1991), *aff'd in part, rev'd in part on other grounds,* 843 S.W.2d 480 (Tex.1992).[3]

injury, because symptoms were typical of only discomfort, not disease; thus, assuming without deciding, viable trespass or negligence claim may arise from mere loss of enjoyment of property, these claims were barred by limitations because nuisance claim was barred). However, Markwardt amended her petition after TXI moved for summary judgment to allege she experienced chronic bronchitis, lung problems, fatigue, headaches, ulcers, and nausea. We conclude that at least chronic bronchitis and ulcers involve more than mere discomfort. Nevertheless, TXI also contended alternatively that all Markwardt's claims were barred by limitations. Therefore, we will analyze the limitations issue relative

■ The overarching issue is determining when Markwardt's claims accrued. As a general rule, "a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996). The discovery rule, when applicable, defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex.1998). Another limitations principle applicable in this case is that accrual of a nuisance claim depends on whether the nuisance is permanent or temporary. *Bates*, 147 S.W.3d at 270. A permanent-nuisance claim accrues when injury first occurs or is discovered, whereas a temporary-nuisance claim accrues anew upon each injury. *Id.* Thus, if a nuisance is temporary, claims for injuries occurring within two years of suit are timely. *See id.* Determining when a cause of action accrued is a question of law. *See id.* at 270, 274–75.

■ A defendant seeking summary judgment based on limitations must (1) conclusively prove when the cause of action accrued and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving, as a matter of law, there is no genuine issue of fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of her injury. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). If the movant establishes that limitations bars the action, the nonmovant must then adduce summary-judgment proof raising a fact issue to avoid the statute of limitations. *Id.*

In its motion for summary judgment, TXI argued that Markwardt alleges a permanent-nuisance claim, all her claims accrued more than two years before she filed suit, and the discovery rule did not defer accrual. On appeal, Markwardt contends TXI failed to prove entitlement to summary judgment on these grounds and also relies on the continuing-tort and fraudulent-concealment doctrines to avoid limitations. Some of Markwardt's issues are interrelated. Specifically, in her first and fifth issues, Markwardt generally contends the trial court erred by granting summary judgment and concluding TXI proved the accrual date of her claims. Thus, our evaluation of these issues incorporates the analysis below of the more specific limitations issues.

## A. Permanent vs. Temporary Nuisance

■ Preliminarily, we must address Markwardt's third issue, challenging the trial court's implicit decision that her claim is based on a permanent nuisance. Markwardt contends the nuisance was temporary; thus, claims for damages occurring within two years before filing suit were necessarily timely. In contrast, TXI contends any alleged nuisance was permanent; thus, her claim accrued when injury first occurred or at least when she discovered an injury. Markwardt's allegation that the nuisance is temporary does not preclude our evaluating the nature of her claim. A plaintiff may not elect whether to assert a temporary or permanent nuisance "because the consequences that flow from the designation as temporary or permanent are not arbitrary but follow directly from underlying facts." *Bates*, 147 S.W.3d at 281. "[A]lternative allegations may be asserted when the facts are unclear. But when they are not, claimants

to all claims and categories of damages al-

leged by Markwardt.

cannot opt for an indefinite limitations period or a series of suits whenever they prefer." *Id.* at 281–82.

 Under Texas law, a nuisance is permanent if it "involves an activity of such a character and existing under such circumstances that it will be presumed to continue indefinitely." *Id.* at 272. Thus, a nuisance is permanent if it is "constant and continuous" and if "injury constantly and regularly occurs." *Id.* A temporary nuisance is of limited duration. *Id.* Thus, a nuisance may be considered temporary if it is uncertain whether any future injury will occur or if future injury "is liable to occur only at long intervals." *Id.* A nuisance is also temporary if it is "occasional, intermittent or recurrent" or "sporadic and contingent upon some irregular force such as rain." *Id.* "[A]nuisance should be deemed temporary only if it is so irregular or intermittent over the period leading up to filing and trial that future injury cannot be estimated with reasonable certainty. Conversely, a nuisance should be deemed permanent if it is sufficiently constant or regular (no matter how long between occurrences) that future impact can be reasonably evaluated." *Id.* at 281.

 Whether a nuisance is permanent or temporary is a question of law unless there is a dispute regarding what interference has occurred or whether it is likely to continue. *See id.* A permanent nuisance may be established by showing that either the plaintiff's injuries or the defendant's operations are permanent. *Id.* at 283 "The presumption of a connection between the two can be rebutted by evidence that a defendant's noxious operations cause injury only under circumstances so rare that, even when they occur, it remains uncertain whether or to what degree they may ever occur again." *Id.*

In its motion, TXI relied on both the allegations in Markwardt's petition and the summary-judgment evidence to prove she claims a permanent nuisance.[4] TXI presented evidence demonstrating that, in late 1997 and 1998, Markwardt vigorously protested TXI's application to The Texas Natural Resource Conservation Commission ("TNRCC") for a permit to expand its programs which entailed burning hazardous waste at the facility. This evidence included a "public comment" by Markwardt, her deposition, and her testimony submitted to the State Office of Administrative Hearings ("SOAH"). TXI also presented various statements, arguments, and testimony provided by Markwardt to the TNRCC and/or SOAH in 2001, when opposing another company, Chaparral Steel Midlothian L.P.'s ("Chaparral"), application for a permit relative to its steel mill in the same area.[5] Some of this evidence relative to Chaparral's permit application also references Markwardt's complaints regarding the TXI facility. Finally, TXI presented the transcript of a hearing conducted in 2003 by the United States Environmental Protection Agency ("EPA"), in which Markwardt complained about TXI's burning of hazardous waste.

Considering both TXI's activities and Markwardt's alleged damages, we conclude she is claiming a permanent nuisance. In particular, Markwardt's petition and the evidence negate that she complains of conditions "so irregular or intermittent over the period leading up to filing [suit] ...

---

4. In its motion, TXI cited some of the allegations in Markwardt's original petition although it was amended after filing of the motion. Thus, we will consider only those allegations in the live petition.

5. Markwardt originally included several "Chaparral" entities as defendants in the present suit but subsequently dismissed her claims against them.

that future injury cannot be estimated with reasonable certainty."

Significantly, Markwardt alleges in her petition that TXI has been burning hazardous waste since 1987 or 1988 (twenty years before she filed suit) and complains of effects accruing "over time" from "years of accumulation" of toxic substances in the air. Many of Markwardt's remarks during the permit proceedings are repetitive, so we will not set forth every statement herein. However, the import of these statements echoed the gist of her pleading relative to the nuisance issue; i.e., she complained that TXI had been engaged for many years in the ongoing burning of hazardous waste. For example, in 1998, Markwardt swore as follows: in late 1989 or 1990, she began smelling chemical odors from TXI's plant and noticed dust accumulation on her property; the odors became stronger and more frequent over the years; and as of 1998, she smelted the odors 50% of the time, noticed the dust every day, and was never certain of a time the odors would be non-existent.[6] *See Walton v. Phillips Petroleum Co.*, 65 S.W.3d 262, 274 (Tex.App.-El Paso 2001, pet. denied), *abrogated on other grounds by In re Estate of Swanson*, 130 S.W.3d 144 (Tex.App.-El Paso 2003, no pet.) (holding landowner's complaint that oil company's salt-water pits caused migration of pollutants into his groundwater alleged permanent nuisance where water was presently contaminated and had been for several years and there was never a time where contamination was non-existent or significantly diminished due to changing conditions, although degree fluctuated).

Additionally, the evidence shows that, in 1999, TXI was granted its permit, thereby demonstrating the activities of which Markwardt complained were likely to continue indefinitely. Notably, according to her petition, these activities did continue for the approximate ten-year period between grant of the permit and her filing suit.

Further, Markwardt does not contend that, as the emissions occurred, she was uncertain of any future damages. Instead, during the permit protests, Markwardt described the following damages she purportedly had sustained, and continued to experience, as a result of TXI's years of burning hazardous waste:

- contamination of her drinking water, as well as her creek and pond, causing the death of fish, frogs, and turtles;
- soil contamination causing stunted growth or death of vegetation;
- inability to enjoy her swimming pool due to odors and dust film on the water;
- birth defects in her dogs, such as crooked tails, missing limbs, paralysis, abnormal genetic qualities, rotted teeth, skin problems, watery eyes, cancer, and early mortality, including deaths of forty to fifty of Markwardt's puppies and thirty adult dogs;
- loss of potential dog sales because she must tell prospective purchasers that noticeable problems are due to TXI's burning of hazardous waste, and purchasers fear future health problems;
- her own chronic bronchitis, depression, anxiety, irritability, headaches, watery and burning eyes and nose, nausea,

---

**6.** In her petition, Markwardt asserts she is suing only for the presence of toxic substances and not mere odors, smoke, soot, or dust. However, in the permit protests, Markwardt intermingled all her complaints about emissions from the plant, whether toxic substances, dust, or odors. Thus, we cannot disregard her statements about the dust and odors at least when evaluating the length and frequency of emissions relative to the nuisance-dichotomy issue.

ulcers, and compromised immune system;[7]

- fear of being outside lest she exacerbate these health problems; and
- lost market value of her property.

Moreover, Markwardt represented she had experienced some of these adverse effects for numerous years before she became involved in the protests. The gist of Markwardt's statements was that these conditions were constant or consistent, and she feared they would persist in the future if TXI were granted a permit to continue its activities. For example, Markwardt characterized the situation with TXI as a "nightmare" and replied as follows when asked how she felt about living near the facility:

... I built this place of mine for the future and will I see the future? NO!!! Unless something is done to stop all this air, water, and soil pollution. I wish that my voice could be heard and not in writing. This is my life and future, not TXI's. When tests are conducted in this area on animals, plants, water, and soil, why are we excluded. We are one of the closest. Is TXI afraid of finding out what they have contaminated on my land, with burning the toxic waste the last 8 years? I'M AFRAID.... Just stop burning the toxic waste and causing the health problems and environmental contamination that has been created in this area ... Look at the true effects that have been caused in this area by TXI burning toxic waste. 5 or 10 years from now when things get worst [sic], who is going to be responsible?

■ Markwardt's allegation regarding lost market value of her property is pertinent to the nuisance dichotomy. If a nuisance is temporary, the landowner may recover only lost use and enjoyment (measured in terms of rental value) that has already accrued. *Bates,* 147 S.W.3d at 276. An isolated occurrence may result in temporary loss of use and enjoyment, but is unlikely to result in permanent loss of market value unless the damage cannot be remedied or is likely to occur again. *Id.* Conversely, if a nuisance is permanent, the owner may recover lost market value: a figure that reflects all losses from the injury, including lost rents expected in the future. *Id.* Consequently, Markwardt's belief that "people would not buy a house or land" in the area based on fear of effects from TXI's burning of hazardous waste reflects she viewed her damages as permanent.

Nevertheless, Markwardt argues that her claim is not barred by limitations because she alleges "a new and different nuisance." *See id.* at 279–80 (recognizing different accrual rules may apply when nature of nuisance substantially changes and "an old nuisance does not excuse a new and different one"). Specifically, she contends that, although TXI has been operating its plant for decades, it did not start burning hazardous waste until 1987 or 1988 and she seeks only those damages caused by this "new and different nuisance." However, for the reasons stated above, the alleged nuisance which began in 1987 or 1988 is classified as permanent. Markwardt does not assert any "new and different nuisance" that began within two years of her filing suit.

Additionally, Markwardt contends the nuisance is temporary because several months after she filed suit, TXI ceased operating the kilns that used hazardous waste as fuel. Markwardt cites the following statement in *Bates:* "We begin with the obvious—if a nuisance is abated, it is

---

7. Markwardt also attributed her husband's numerous health problems to TXI's emissions; however, he was deceased by the time she filed this suit.

no longer permanent." *Id.* at 284. However, this statement must be read in context. The court was citing a former decision, in which it held that "[a]n injury which can be terminated cannot be a permanent injury." *Id.* at 284 & n. 98 (citing *Kraft v. Langford,* 565 S.W.2d 223, 227 (Tex.1978)). The *Bates* court then proceeded to explain at length the reasons it refused to recognize abatement as a factor in the analysis of whether a nuisance is temporary or permanent. *See id.* at 283–90. The court concluded that "abatement may convert a permanent nuisance into a temporary one, but it also may not" because abating a permanent nuisance will not always terminate the injury. *Id.* at 286.

■ Significant to the present case, the court addressed the problematic effects on limitations of using abatement as a factor. *See id.* at 288–89. If a permanent nuisance has been operating for many years, limitations will have long since barred suits for lost market value. *Id.* at 288. However, if the nuisance may be rendered temporary by later abatement, losses suffered within two years before filing become recoverable again although they were necessarily part of the same losses that were previously barred. *Id.* To permit barred claims to be revived years later would undermine society's interest in repose and raise constitutional concerns. *Id.* Therefore, abatement cannot revive barred permanent damages by allowing them to be asserted as temporary. *Id.* at 289. In the present case, this concern regarding repose would be abrogated if the lost market value and other permanent damages which Markwardt claimed at least ten years before filing suit now became recoverable as temporary-nuisance damages merely because TXI ceased burning hazardous waste after she filed suit. Accordingly, we conclude that Markwardt

alleges a permanent-nuisance claim despite abatement of the nuisance.

**B. Accrual and the Discovery Rule**

Markwardt's second, fourth, sixth, ninth, and a portion of her tenth issues are interrelated; she contends that, even if the nuisance is permanent, TXI failed to prove she discovered, or should have discovered, the nuisance claim and her other causes of action more than two years before she filed suit.

**1. Applicability of the Discovery Rule**

■ As an initial matter, under Texas law, the discovery rule is a "very limited exception" to accrual when an injury is both "inherently undiscoverable" and "objectively verifiable." *Id.* at 279. In its motion for summary judgment, TXI contended the discovery rule is inapplicable because Markwardt's claims were not "inherently undiscoverable"; but, alternatively, even if the discovery rule were applicable to these types of claims, Markwardt discovered, or should have discovered, her claims more than two years before she filed suit.

However, Markwardt cites the following federal statute, contained in CERCLA, governing state statutes of limitations for hazardous-substance cases:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at

the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1).

For purposes of this provision, "federally required commencement date" is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." *Id.* § 9658(b)(4)(A). Thus, this definition is substantially the same as the discovery rule under Texas law. *See id.; Neel,* 982 S.W.2d at 886; *see also Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.,* 419 F.3d 355, 362 (5th Cir.2005) (stating, section 9658 engrafts a discovery rule on state statutes of limitations, deferring accrual of a claim until plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action); *Avance v. Kerr–McGee Chemical LLC,* No. 5:04–CV–209–DF, 2007 WL 1229710, at *8 (E.D.Tex. Apr. 26, 2007) (recognizing "federally required commencement date" is "virtually identical" to "notion of an accrual date" under Texas law, requiring party to commence suit when she knew, or should have known, of the cause of action).

TXI disputes that CERCLA applies in the present case. Further, we note that the above-cited statute does not mention damages such as pure loss of use and enjoyment of property, as opposed to actual personal injuries or property damages. Nevertheless, as discussed below, we conclude that, even applying the discovery rule, all Markwardt's claims accrued more than two years before she filed suit. Thus, we will assume, without deciding, the CERCLA provision mandates a discovery-rule analysis with respect to all Markwardt's claims regardless of the prerequi-

sites under Texas law for application of the rule, i.e., that the injury be "inherently undiscoverable" and "objectively verifiable."

### 2. Discovery–Rule Analysis

The evidence we have discussed relative to the nuisance dichotomy is also pertinent to the discovery-rule analysis. As TXI contends, the evidence demonstrates Markwardt has been complaining, for at least ten years before filing suit, that TXI's emissions caused the same damages she seeks in this suit.

Despite her previous statements, Markwardt relies on a "latent-disease" or "objective-verification" principle to argue that the discovery rule deferred accrual of her claims until less than two years before she filed suit. In *Childs v. Haussecker,* 974 S.W.2d 31, 37–39 (Tex.1998), the Texas Supreme Court recognized that, for limitations purposes, "latent diseases" are different than "traumatic" injuries. Therefore, the court not only held that the discovery rule necessarily applies to "latent diseases," but also refined the principles for applying the discovery rule in "latent occupational disease cases." *Id.* at 37–44.

Specifically, the court announced that accrual of a "latent occupational disease" claim is deferred "until a plaintiff's symptoms manifest themselves to a degree or for a duration that would put a reasonable person on notice that he or she suffers from some injury and he or she knows, or in the exercise of reasonable diligence should have known, that the injury is likely work-related." *Id.* at 40. Although diagnosis of a latent occupational disease is sufficient to start the limitations period, accrual is not necessarily deferred until a confirmed medical diagnosis or the plaintiff discovers the precise name of the disease, the fact it is permanent, or the seriousness of the disease; a plaintiff whose condition has not yet been affirmatively

diagnosed by a physician can have, or in the exercise of reasonable diligence could have, access to information that requires, or would require, a reasonable person to conclude he likely suffers from a work-related illness. *Id.* at 40–42. However, such a cause of action should not accrue absent some "objective verification" of a causal connection between injury and toxic exposure, provided that failure to obtain such verification is not occasioned by a lack of due diligence. *Id.* at 43. Accordingly, a diligent plaintiff's "mere suspicion" or "subjective belief" that a causal connection exists between her exposure and symptoms is, standing alone, insufficient to establish accrual as a matter of law. *Id.* Inquiries regarding the discovery rule, including its application in latent-occupational-disease cases, usually entail questions for the trier of fact. *Id.* at 44. However, commencement of the limitations period may be determined as a matter of law if reasonable minds could not differ about the conclusion to be drawn from the facts in the record. *Id.*

Markwardt suggests her health conditions constitute latent diseases because they resulted from repeated exposure to TXI's emissions. Therefore, citing *Childs,* Markwardt contends her previous statements during the permit protests demonstrated "mere suspicion" or "subjective belief" that TXI's emissions caused her damages, but she did not obtain "objective verification" of a causal connection until June 2006. TXI does not concede Markwardt has evidence beyond "mere suspi-

cion" or "subjective belief," but argues, "to the extent [she] has any such evidence, she has had it for at least ten years."

We note that it is unclear whether the *Childs* court intended for its refined rules to apply in all cases involving latent diseases or only those contracted in an "occupational" setting. *See id.* at 37–44.[8] Additionally, Markwardt cites no cases from the Texas Supreme Court, our court, or the Waco Court of Appeals, applying the refined rules outside the context of "occupational" latent diseases; however, she does cite a Texarkana Court of Appeals case applying these rules to a plaintiff's claim that toxic contaminants from neighboring operations caused her latent diseases. *See Nugent v. Pilgrim's Pride Corp.,* 30 S.W.3d 562, 571–74 (Tex.App.-Texarkana 2000, pet. denied). Moreover, although the *Childs* court addressed only "diseases" and Markwardt primarily relies on *Childs* with respect to her personal-injury claim, she also suggests "objective verification" was required for accrual of all her claims.

Nevertheless, we need not decide whether the refined rules set forth in *Childs* apply to latent diseases contracted in a non-occupational setting and claims for damages other than personal injuries because, even applying these rules, Markwardt's claims are barred by limitations. We conclude reasonable minds could not differ that, to the extent information Markwardt obtained in 2006 constitutes "objective verification" for limitations purposes of a causal connection between her

8. In particular, the court made clear at the outset of its discussion the discovery rule applies in "latent disease" cases. *See Childs,* 974 S.W.2d at 37–40. The court then indicated it would further refine the discovery rule for *"occupational"* cases: "While a diligent plaintiff who allegedly suffers from a latent injury or disease should be able to claim the benefit of the discovery rule, these causes raise questions about the correct formulation and application of that rule in latent occupational disease cases." *Id.* at 39. However, when discussing the refined rules, the court primarily referred to "latent occupational diseases," but intermingled the term "latent diseases" in the discussion several times. *See id.* at 39–44.

damages and TXI's emissions, Markwardt obtained, or through reasonable diligence should have obtained, such information at least by 2001 (seven years before filing suit).

### Markwardt's personal injuries

▇▇ To raise a fact issue on whether she previously possessed mere suspicions that TXI's emissions were harming her health, Markwardt cites several statements during the permit proceedings. When opposing the TXI application in 1998, she essentially referred to her own "beliefs" and "assumptions" regarding such adverse effects, admitted she possessed no other evidence, and testified no doctor had told her the cause of her chronic bronchitis. When opposing the Chaparral permit in 2001, Markwardt testified her physician, Dr. Ledbetter, said "it's possible" her conditions were caused by both TXI and Chaparral emissions although he had not made that diagnosis.

Markwardt presented her own affidavit as evidence she did not obtain "objective verification" until 2006. In particular, Markwardt averred,

It was not until at least June 2006 that I learned that TXI's burning of hazardous waste was causing damage to my health. In June 2006, testing revealed that I had abnormally high levels of aluminum and manganese in her [sic] body.... In September 2006 and April 2007, I was found to have nodules in my lungs.... On May 24, 2007, my doctor at Baylor told me that he believed my "significant health issues" were likely "due to aluminum toxicity." ... This was the first time a doctor told me my health problems were likely caused by exposure to toxic substances. I brought suit on

March 12, 2008, within two years of discovering my injuries....

Markwardt also presented the above-referenced test results, a radiology report confirming nodules in her lungs, and a May 24, 2007 letter from Dr. Ledbetter, summarizing Markwardt's medical history and stating:

She has lived in a home that has very high levels of aluminum in the soil and in the dust that is found in the home. She has had a urinalysis that shows her aluminum level to be markedly elevated and it should be zero.... Today I have referred her to ... a pulmonary specialist who has special interest in environmental heavy metal poisoning. I anticipated that he will confirm that Ms. Markwardt's symptoms are in fact due to aluminum toxicity....

Considering Markwardt's affidavit and Dr. Ledbetter's report, she may not have obtained, before June 2006, testing confirming elevated levels of toxins in her body or been told by a doctor, before May 24, 2007, that her health problems were "likely" caused by such toxins.[9] However, we have considered Markwardt's previous statements during the permit protests in context when determining whether a reasonable person knew, or should have known, at that time that her health conditions allegedly resulted from TXI's emissions.

Specifically, Markwardt's 2001 testimony evolved from initially answering "no" when asked whether Dr. Ledbetter told her the cause of her bronchitis to stating that Dr. Ledbetter said "it's possible" her health problems were caused by TXI's emissions. However, she then testified as

**9.** In his letter, Dr. Ledbetter did not attribute the high levels of aluminum on Markwardt's person or property to TXI's operations. Nevertheless, construing the evidence in the light most favorable to Markwardt, she interpreted his opinions as attributing these high levels of aluminum to TXI's operations.

follows regarding discussions with Dr. Ledbetter: "after finding out where we live and all that, now it's kind of narrowed down to more or less a lot of this is coming from emissions from Chaparral and TXI." Therefore, at that point, Markwardt had obtained information from another source attributing her conditions to the plant emissions. In fact, "narrowed down" is no less emphatic than Dr. Ledbetter's 2007 opinion that her issues are "likely" due to toxic exposure, which Markwardt contends triggered the limitations period.

Additionally, Markwardt testified in 1998 that she had her drinking water tested several years earlier, which revealed contamination with elevated levels of aluminum and other metals. Although this testing was not performed on Markwardt's person, she suggested her health problems were caused not only by breathing toxic substances but also via contaminated drinking water.

At the least, Markwardt offers no reason why, by 2001, she had failed to obtain testing of her person or consult a physician specializing in "environmental heavy metal poisoning" or a similar field to confirm her beliefs, considering she had already developed all the conditions of which she now complains. The totality of Markwardt's previous statements, including the following, support a conclusion that a reasonable person would have pursued such course of action: despite Markwardt's references to mere "assumptions," she testified at one point, "So my *conclusion and my assumption,* there's *only one person responsible* for all the problems in the area is TXI burning the toxic waste" (emphasis added); she claimed "almost everyone" in the area, including her husband, had health problems which developed after TXI started burning hazardous waste; at a "Downwinders" meetings in the early to mid 1990s, doctors and a representative from the American Lung Association discussed potential long-term health effects of pollutants, including TXI's burning of hazardous waste; she also experienced deformities and deaths in numerous dogs as well as wildlife; she described feeling like "an experiment sample"; and by 2003, when she testified before the EPA, she attributed extensive past medical bills to TXI's activities: "I bet you I haven't figured out the health bills. It'd be in the millions. I've got a stack of claims like this that my health insurance has paid throughout the years we've lived in Midlothian."

Finally, we conclude *Childs* is factually distinguishable from the present case. The *Childs* court found a genuine issue of material fact concerning when both plaintiffs discovered, or in the exercise of reasonable diligence, should have discovered, they suffered from an occupational disease—silicosis. 974 S.W.2d at 44–47. The court rejected one plaintiff's argument that, as a matter of law, his claim accrued when he was first diagnosed with silicosis. *Id.* at 44. However, the court also disagreed the claim necessarily accrued at least twenty years earlier, when the plaintiff experienced respiratory problems, suspected he might have an occupational illness because several coworkers suffered similar health problems, including one who died of silicosis, actually filed a workers' compensation claim alleging he suffered from silicosis, and filed suit to appeal denial of the claim. *Id.* at 44–45. Although the plaintiff's condition deteriorated during this twenty-year period, the court emphasized that two doctors had told the plaintiff his illness was *not* work-related and suggested other specific causes for his condition. *See id.* at 45. Further, the plaintiff's workers' compensation claim and earlier lawsuit were abandoned precisely because there was no evidence to support

a connection between his condition and his employment. *Id.* at 46.

Similarly, the *Childs* court rejected the other plaintiff's suggestion that his claim necessarily accrued when he was first diagnosed with silicosis—within two years of filing suit. *See id.* at 46–41. However, the court also disagreed with the defendants' contention that the claim necessarily accrued several years before filing suit when the plaintiff experienced respiratory problems which he associated with his work as a sandblaster, knew he had been exposed to silica, knew his brother, also a sandblaster, suffered from silicosis caused by breathing occupational dust, and filed a workers' compensation claim as a precaution to prevent a time bar. *See id.* The court did conclude a reasonably diligent person would have sought medical advice at that point or shortly thereafter, but the plaintiff did not do so until a year later. *See id.* at 47. Nevertheless, the court held the claim was not time-barred as a matter of law because the defendants failed to offer summary-judgment evidence demonstrating such diligent action would have led the plaintiff to discover he suffered an occupational disease. *Id.*

In contrast, by 2001, a doctor had suggested to Markwardt a connection between her conditions and TXI's emissions, and testing of her water revealed the contamination that allegedly caused her health problems, in part. Moreover, the *Childs* plaintiffs' filing workers' compensation claims as a precaution to toll limitations if their conditions were work-related is quite different from Markwardt's public and vehement insistence under oath, over a period of five years, that her health problems were caused by TXI's burning of hazardous waste—a position she adopted so strongly that she urged denial of a permit for TXI to continue, or increase, this activity. Considering all of the evidence, we hold that Markwardt knew, or through the exercise of reasonable diligence should have known, by 2001, that her health problems were allegedly caused by TXI's emissions.

### Nuisance Damages

█ With respect to the claim for lost use and enjoyment of her property, Markwardt necessarily discovered this injury as early as 1998 because the damages are entirely subjective. Whether TXI's emissions actually harmed Markwardt's health and property is another issue. However, by 1998, Markwardt at least expressed fear the emissions were causing such harm and deprived her of the ability to enjoy her property. In short, Markwardt's own beliefs *were* the objective verification of an alleged causal connection between TXI's emissions and her nuisance damages.

### Property Damage

█ Markwardt contends her suspicions that TXI's emissions harmed her dogs were not confirmed until 2006. Specifically, in her affidavit, Markwardt averred that testing of some dogs from March 20, 2006 to May 31, 2006 demonstrated elevated levels of aluminum, chromium, mercury, nickel and zinc; and, on December 21, 2007, a veterinarian informed her that there was a "definite possibility" health problems with one dog were "due to a toxin of some type." Markwardt also produced a report from the veterinarian confirming this statement.

However, in her 1997 public comment opposing TXI's permit application, Markwardt stated that, several months earlier, a puppy collapsed and died and when an autopsy was performed, "[t]hey found no problems with him whatsoever. They said it had to be *some kind of toxic fumes that killed him,* a four-month-old pup." (emphasis added). In her 2001 testimony, Markwardt claimed a veterinarian told her on

"numerous occasions" that "it's very possible" her dogs' birth defects were caused by plant emissions. She further testified that blood testing performed on one deformed dog showed elevated "T-cells" and the veterinarian said "it could be possible" this condition was due to plant emissions. Again, these statements were substantially similar to the information Markwardt received from the veterinarian in December 2007, which she claims triggered the limitations period.

At the least, no later than 2001, Markwardt, in the exercise of reasonable diligence, could have obtained such verification if there were indeed a causal connection. Specifically, during the 2001 proceeding, she agreed that "the Court" had approved Chaparral's request to inspect her property, including obtaining stool and blood samples from the dogs; however, she refused any such inspection unless she was allowed to set the parameters. Once again, the totality of Markwardt's statements during the permit protests, emphatically attributing health problems and deaths of numerous dogs to TXI's emissions, supports a conclusion that a reasonable person would have pursued such testing of the dogs. We reject the reasoning that Markwardt could refuse the testing, when opposing the permit application, yet years later assert she previously lacked "objective verification" of a causal connection between plant emissions and her dogs' health problems, when arguing her suit is not barred by limitations.

With respect to the alleged contamination of her real property, Markwardt averred in her affidavit that testing of the property by the TNRCC, and its successor, the Texas Commission on Environmental Quality ("TCEQ"), in 1995, 2001, and 2005 produced negative results. Markwardt also presented a report published by the TNRCC in October 1995 on the potential impact of emissions from Midlothian industries, concluding that "exposure to the monitored levels are not likely to result in adverse health effects" in area residents. Markwardt further averred that testing of her land from March 14 to 17, 2006 revealed elevated levels of aluminum, cadmium, chromium, manganese, and zinc. Markwardt seems to argue that the TNRCC/TCEQ test results and report negate she discovered, before the March 2006 testing, a causal connection between TXI's emissions and any of her damages.

However, during the permit protests, Markwardt expressly discounted the TNRCC's conclusions, claiming she would not "believe" its test results, pertinent TNRCC officials were "paid off," the TNRCC did not conduct adequate testing, and its conclusions were based solely on evidence submitted by TXI. The sole fact that she participated in the protests—after one of the TNRCC studies—demonstrates she was not placated by the TNRCC's conclusions. Consequently, we reject Markwardt's reasoning that she could dispute the TNRCC's conclusions and cite her own testing revealing water contamination, when opposing the permit applications, yet years later rely on the TNRCC's conclusions to argue she previously lacked knowledge TXI's emissions allegedly harmed her health and property.

Further, there is no evidence that, at some point within two years of Markwardt's suit, the TNRCC/TCEQ changed its position and agreed with Markwardt's claims. In her affidavit, Markwardt did not identify the entity that conducted the testing in March 2006 which yielded positive results. However, she produced evidence that, in December 2007, the TCEQ remarked, "air toxics monitoring in the Midlothian area not only indicates accept-

able air quality but also better air quality than most monitored areas of the country." Therefore, only a few months before Markwardt filed suit, governmental authorities continued to conclude the emissions were not harmful. In sum, the record reflects this case is not a situation in which governmental authorities led Markwardt to defer her causes of action until they acknowledged harm from TXI's emissions. Rather, Markwardt has continually maintained since the late 1990s that the emissions were harmful while governmental authorities have continued to reject such allegations. Accordingly, we disagree that Markwardt was permitted to depend on governmental agencies to provide any "objective verification" needed for her claims to accrue.

Finally, as evidence she could not have discovered her causes of action more than two years before filing suit, Markwardt relies on two press releases issued by TXI in 1999, praising the decisions of the SOAH and the TNRCC on TXI's permit applications and representing its activities did not harm the environment and public health. We conclude the press releases are more appropriately considered in the fraudulent-concealment analysis, as discussed below. However, for purposes of the discovery-rule analysis, quite simply, a cause of action would likely never accrue if accrual were deferred until the defendant provided "objective verification" because it is rare that a defendant would admit liability. As Markwardt averred in her affidavit, TXI has always claimed its burning of hazardous waste did not harm the environment or public health. Accordingly, we conclude Markwardt may not depend on TXI to provide any "objective verification" necessary for her claims to accrue.

In sum, the trial court did not err by determining as a matter of law that Markwardt discovered, or should have discover-

ed, all her claims more than two years before she filed suit. We overrule her second, fourth, sixth, and ninth issues and the portion of her tenth issue addressing the discovery rule.

## C. Continuing–Tort Doctrine

In another portion of her tenth issue, Markwardt argues the trial court erred by refusing to apply the continuing-tort doctrine. Markwardt cites *The Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542 (Tex.App.-Dallas 1994, writ denied), in which the court stated that a continuing tort is an ongoing wrong causing a continuing injury which does not accrue until the tortious act ceases.

■ We note that the continuing-tort doctrine has been addressed by several courts of appeals but not adopted by the Texas Supreme Court. *See, e.g., Yalamanchili v. Mousa*, 316 S.W.3d 33, 40–41 (Tex.App.-Houston [14th Dist.] 2010, pet. filed); *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 443 (Tex.App.-Fort Worth 1997, pet. denied); *Upjohn Co.*, 885 S.W.2d at 542–44; *see also Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 n. 8 (Tex. 2005) (noting supreme court has neither endorsed nor addressed continuing-tort doctrine). Nevertheless, even courts of appeals addressing the doctrine have held it does not apply to permanent injury to land. *See, e.g., Yalamanchili*, 316 S.W.3d at 40–41; *Bartlett*, 958 S.W.2d at 443. Accordingly, the doctrine cannot apply to Markwardt's causes of action for nuisance and real-property damages. *See Yalamanchili*, 316 S.W.3d at 40–41 (holding continuing-tort doctrine did not apply to landowner's trespass claim, complaining of dead vegetation and foundation damage due to run-off water from neighboring shopping center because he alleged permanent injury to land); *Bartlett*, 958 S.W.2d at 443 (holding continuing-tort doctrine in-

applicable to landowners' suit for nuisance, negligence, violation of agency rules, trespass, and fraud, alleging contamination to his groundwater from oil company's wells, because injuries were permanent).

■ Markwardt contends the trial court erroneously granted summary judgment on the personal-injury claims because, in its motion, TXI failed to specifically negate application of the continuing-tort doctrine to these claims. In the motion, TXI asserted the continuing-tort doctrine was inapplicable to TXI's claims based on permanent injury to land, but did not specifically mention the doctrine with respect to the claims for Markwardt's personal injuries and damages to the dogs. Assuming, without deciding, that a summary-judgment movant bears the burden to negate application of the continuing-tort doctrine, TXI did negate application of the doctrine to these claims.[10]

Both the Waco Court of Appeals, whose precedent we must follow in this case, and the *The Upjohn Co.* court have recognized the continuing-tort doctrine is rooted in a plaintiff's inability to know ongoing conduct is causing her injury; thus, the rationale for the doctrine no longer applies if the claimant has discovered her injury and its cause and the statute commences to run upon discovery. *Walston v. Stewart,* No. 10–05–00135–CV, 2005 WL 3072919, at *1 (Tex.App.-Waco Nov. 16, 2005, pet. denied) (mem.op.); *see The Upjohn Co.,* 885 S.W.2d at 544 (citing *Atha v. Polsky,* 667 S.W.2d 307, 310 n. 3 (Tex.App.-Austin 1984, writ ref'd n.r.e.)); *Tectonic Realty Inv. Co. v. CNA Lloyd's of Tex. Ins. Co.,* 812 S.W.2d 647, 654 (Tex.App.-Dallas 1991, writ denied), *disapproved of on other grounds by Johnson & Higgins of Tex.,*

*Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507 (Tex.1998). Consequently, TXI essentially negated application of the continuing-tort doctrine to Markwardt's claims for personal injuries and damages to the dogs, despite its lack of specific reference to these claims, by proving she discovered all her causes of action over two years before filing suit. *See Walton,* 65 S.W.3d at 275 (rejecting plaintiff's contention that trial court erroneously granted summary judgment based on limitations although, in motion, defendant failed to address plaintiffs continuing-tort claim; doctrine was inapplicable to permanent injury to land, and court had already concluded defendant proved plaintiff alleged permanent injury to land).

Accordingly, the trial court did not err by refusing to apply the continuing-tort doctrine. We overrule the portion of Markwardt's tenth issue addressing this doctrine.

## D. Fraudulent–Concealment Doctrine

■ Finally, in her seventh and eighth issues, Markwardt argues the trial court erred by concluding the fraudulent-concealment doctrine does not apply to her claims.

■ The fraudulent-concealment doctrine is an affirmative defense to the statute of limitations. *See KPMG Peat Marwick,* 988 S.W.2d at 749; *Ponder v. Brice & Mankoff,* 889 S.W.2d 637, 645 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Fraudulent concealment is founded in the principle of estoppel; a defendant should not be permitted to avoid liability for its actions by deceitfully concealing wrongdoing until limitations has

---

10. At least one court has suggested that the continuing-tort doctrine is an exception to the statute of limitations on which the non-movant must present a genuine issue of material fact. *See Palombo v. Southwest Airlines Co.,* No. 04–05–00825–CV, 2006 WL 1993783, at *4 (Tex.App.-San Antonio Jul. 19, 2006, pet. denied) (mem.op.).

run. *See S.V.*, 933 S.W.2d at 6; *Vial v. Gas Solutions, Ltd.*, 187 S.W.3d 220, 229 (Tex.App.-Texarkana 2006, no pet.); *Bartlett*, 958 S.W.2d at 439. When the doctrine applies, the statute of limitations is tolled until the injured party, using reasonable diligence, discovered or should have discovered the injury. *KPMG Peat Marwick*, 988 S.W.2d at 750. A plaintiff relying on the defense must assert it in response to the summary-judgment motion and present evidence raising a fact issue on each element. *KPMG Peat Marwick*, 988 S.W.2d at 749. The elements of fraudulent concealment are (1) existence of the underlying tort, (2) the defendant's knowledge of the tort, (3) the defendant's use of deception to conceal the tort, and (4) the plaintiffs reasonable reliance on the deception. *Vial*, 187 S.W.3d at 229; *Bartlett*, 958 S.W.2d at 439.

As we have mentioned, to support her fraudulent-concealment argument, Markwardt presented press releases issued by TXI in 1999 after the SOAH's and TNRCC's decisions that TXI should be granted its ten-year permit. In the press releases, TXI stated:

> This decision should put to rest, once and for all, the inaccurate claims that have been made by our opponents. The evidence presented at the hearings provided overwhelming proof that this process meets tough federal and state safety standards and is safe for the environment....

> After four months of hearings and more than 50 witnesses, those who oppose this program failed to provide a single medical doctor or toxicologist who could testify under oath that this program has harmed or will harm anyone.... In fact, studies by the TNRCC, the Environmental Protection Agency, The Texas Department of Health, as well as the

cities of Arlington, Cedar Hill and Duncanville, all show the program is safe. Exhaustive examination has shown the program meets tough federal and state safety standards and is safe for the environment.... The TNRCC has validated what we have known all along—this is an innovative program that makes good environmental and business sense.

Markwardt suggests she relied on these representations to defer filing suit until 2008.

Relative to the first element of the fraudulent-concealment doctrine, we will assume, without deciding, that Markwardt presented more than a scintilla of evidence that emissions from TXI's plant did harm her health and property. However, Markwardt presented no summary-judgment evidence to support the second and third elements of a fraudulent-concealment defense: TXI was aware of, and used deception to conceal, this fact. Fraudulent concealment requires actual knowledge by the defendant that a wrong has occurred and "a fixed purpose to conceal the facts necessary for the plaintiff to know that it has a cause of action." *Vial*, 187 S.W.3d at 230–31; *see Bartlett*, 958 S.W.2d at 439 (stating, gist of fraudulent-concealment doctrine is defendant's active suppression of truth or failure to disclose when defendant has duty to disclose).

In her brief, Markwardt asserts, "TXI is presumed to have knowledge of the tort because the tort is based on TXI's burning of hazardous waste, an activity of which it was obviously aware." TXI's obvious knowledge it was burning hazardous waste did not equate to knowledge this activity harmed the health and property of area residents. Markwardt presented no evidence TXI actually believed the emissions were having such adverse effects on area residents. Therefore, on this record, TXI's press releases did not evince a fixed

attempt to deceive the public about any such adverse effects. Rather, the press releases were simply a denial that TXI's activities were having such adverse effects—a position TXI still maintains today in this suit. TXI's mere adherence to a position contrary to Markwardt's position did not constitute evidence of fraudulent concealment of her causes of action.

With respect to the fourth element of fraudulent concealment, the evidence negates reliance, much less reasonable reliance, by Markwardt on TXI's representations. Once a plaintiff knows, or should know, of the defendant's deceit, reliance is no longer reasonable, and the tolling effect of the fraudulent-concealment doctrine ends. *Bartlett*, 958 S.W.2d at 439; *see Ponder*, 889 S.W.2d at 645 (recognizing estoppel effect of fraudulent concealment ends when party learns of facts, conditions, or circumstances that would cause a reasonable person to make inquiry, which, if pursued, would lead to discovery of cause of action). Even if there were evidence that TXI's press releases were deceitful, Markwardt clearly did not believe TXI's representations because she subsequently maintained during the 2001 Chaparral permit proceeding and the 2003 EPA hearing that TXI's emissions indeed harmed her health and property. Moreover, we have already outlined all the evidence establishing that Markwardt knew, or should have known, by 2001, that TXI's emissions allegedly harmed her health and property. Accordingly, the trial court did not err by refusing to apply the fraudulent-concealment doctrine. We overrule Markwardt's seventh and eighth issues.

## IV. Conclusion

Having overruled all of Markwardt's contentions pertaining to the specific limitations issues, we conclude the trial court did not err by determining Markwardt's claims accrued more than two years before she filed suit and granting summary judgment in favor of TXI. Accordingly, we overrule her more general first and fifth issues.

We affirm the trial court's judgment.